## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. 20-cv-1205

**BERNADETTE ROMERO**, parent of Ronald T. Romero, and Personal Representative of the Estate of Ronald T. Romero, deceased;
**LEONARD MARTINEZ**, parent of Ronald T. Romero, deceased.

    Plaintiffs,

v.

**CITY OF WESTMINSTER**, a Colorado municipal corporation;
**"WPD OFFICER A"**, in his individual capacity;

    Defendants.

---

### COMPLAINT AND JURY DEMAND

---

COMES NOW Plaintiffs, by and through their counsel, Baumgartner Law, L.L.C., to respectfully submit this Complaint against the Defendants and allege and aver as follows:

### JURISDICTION AND VENUE

1. This action is brought pursuant to 42 U.S.C. §1983, §1988 and the Fourth Amendment to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §1331 (federal question), §1343(a)(3) and (4) (civil rights), and the aforementioned statutory and constitutional provisions.

2. Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391(b) because the Defendants are citizens and residents of Colorado, and the events, acts, and/or omissions giving rise to this action occurred in Colorado.

## PARTIES

3. Plaintiff, Bernadette Romero ("Bernadette"), is and was at all relevant times a citizen of the State of Colorado, residing in Denver County, Colorado. Bernadette is the mother of Ronald T. Romero ("Ronald"), deceased, and the duly appointed personal representative of his estate, Denver Probate Court, [20PR30282].

4. Plaintiff, Leonard Martinez ("Leonard"), is and was at all relevant times a citizen of the State of Colorado, residing in Adams County, Colorado. Leonard is the father of Ronald T. Romero, deceased.

5. Defendant, City of Westminster ("Westminster"), is and was at all relevant times a Colorado municipal corporation located in Adams County and Jefferson County, Colorado, with final policy-making authority over its police officers, specifically including the individual Defendant named herein.

6. Defendant, WPD Officer A ("Officer A"), is or was at all times relevant a citizen of the State of Colorado, employed as a police officer for the City of Westminster in Adams County and Jefferson County, Colorado, and acting within the course and scope of his employment and under color of state law. The identity of Officer A is unknown to Plaintiffs at this time, but will be revealed through the course of discovery.

## GENERAL ALLEGATIONS

7. Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

8. On June 26, 2018, at 1:50 p.m., an employee of Sofi Westminster Apartments at 10305 Dover Street, Westminster, Colorado called Westiminster police and reported that they beleieved a young man was illegally accessing a mailbox. At 1:50 pm Westminster Police dispatch responded to that call.

9. Westminster Police dispatch aired that a male suspect, later identified as Ronald T. Romero, was leaving the scene in a red Jeep with license plate number 417ZBJ. Westminster Police dispatch never indicated that Ronald was known or believed to be armed with any weapons. Ronald did not make any threats of violence to another person.

10. On June 26, 2018, Officer A was assigned to Westminster Police traffic unit as a motorcycle officer and was on duty from 11:00 a.m. to 9:00 p.m.

11. At 1:52 p.m., Officer A heard an alert on his radio regarding the aforementioned incident, and he heard dispatch air the description of the vehicle that was leaving the scene. Officer A did not hear anything from dispatch indicating that the suspect was actually or believed to be armed with any weapons, or that he made any threats of violence towards another person.

12. Moments later, Officer A saw a red Jeep driving and confirmed that the license plate of this vehicle matched the plate and the vehicle involved in the alleged incident.

13. Officer A began following the Jeep, but he did not activate his emergency lights, which is contrary to Westminster Police Department policies and procedures.

14. Officer A followed the Jeep through a construction zone while also airing the progress of the call on his police radio.

15. Officer A stated that the driver of the Jeep was not driving erratically, at unreasonable speeds, or displaying any behavior that would indicate an intention to use the Jeep as a weapon.

16. At all times, Ronald was driving in a controlled manner and posed no threat to the officers or others.

17. At 1:55 p.m., Officer DiGiovanni began following the Jeep with Officer A.

18. Officer DiGiovanni passed Officer A and became the primary officer following the Jeep. Officer DiGiovanni did not activate his emergency lights, which is contrary to Westminster Police Department policies and procedures.

19. Officer DiGiovanni requested that non-motorcycle patrol officers stop or disable the Jeep. Non-lethal force was requested because neither Officer A, Officer DiGiovanni, or any other reasonable officer, had probable cause for believing Ronald was or would pose an imminent threat of death or serious bodily injury to anybody, including themselves.

20. Officer A heard over the radio that another officer was preparing to set up stop sticks in the roadway ahead in an attempt to disable the Jeep. However, the stop sticks were never deployed at any time.

21. Officer A and Officer DiGiovanni continued following the Jeep as it turned into an area near the Brunswick Bowling Alley.

22. Ronald continued to drive in a controlled and safe manner.

23. Officer A stopped his motorcycle facing east in the southbound lane of Fenton Street and watched the Jeep, which was still being followed by Officer DiGiovanni.

24. Officer A stated that he was parked and looking to see which direction the Jeep would travel. This is not a trained maneuver by Officer A. In reality, Officer A was intentionally putting himself in what he believed would be the path of the Jeep.

25. Officer A stated that he then saw the Jeep make a turn onto Fenton Street and begin traveling northbound in the northbound lane. Officer A remained in the southbound lane of Fenton Street.

26. Officer A stated that the distance between his position and the Jeep was approximately 150 yards.

27. Officer A stated that there was absolutely no pedestrian traffic in the vicinity of where the shooting occurred and there were not any officers directly in the path of the Jeep, including himself.

28. Officer A stated that the Jeep was moving slowly while traveling northbound on Fenton Street. The Jeep never once merged into the southbound lane while traveling northbound. Thus, the Jeep was never heading directly towards officer A.

29. There were no skid marks, yaw marks, or combination marks present on Fenton Street after the incident, which indicates that the Jeep did not quickly steer or maneuver in the direction of Officer A. If the Jeep had have made a quick maneuver into the southbound lane, as described by Officer A, then there would be skid marks, yaw marks, or combination marks on the road left by the Jeep. Officer A's claims about being in the direct path of the Jeep are false and unreasonable.

30. Officer A stated that the Jeep was traveling about 30 miles per hour as it traveled northbound on Fenton Street in the northbound lane.

31. Based on Crash Data Retrieval Analysis, the Jeep was traveling less than 30 miles per hour prior to coming to a stop. At no point did Ronald accelerate quickly, as falsely stated by Officer A.

32. Officer A did not move or make any attempt to maneuver his motorcycle or his body out of the road. The Jeep still never maneuvered so that it would be traveling directly at officer A. Officer A was never in the direct path of the Jeep and always remained a safe distance from the vehicle.

33. Officer A falsely claims that the driver's intent was to run him over in order to avoid arrest by police. There was not any information available to Officer A that would allow him, or any other reasonable officer, to know or formulate a reasonable belief about Ronald's intent. At no point had Ronald attempted to use the Jeep as a weapon and he did not ever maneuver the Jeep so that any officer or citizen was in its direct path, which indicates there was never intent to cause harm to another person. Officer A's claims about Ronald's intent are false and unreasonable.

34. Officer A falsely claims that he was staring directly into Ronald's eyes as the Jeep was driving less than 30 miles per hour on Fenton Street.

35. Officer A falsely stated that he drew his weapon and shot three (3) times from a seated position on his motorcycle into the front windshield on the driver's side of the Jeep.

36. Officer A stated that the Jeep then crossed onto the eastbound lanes of 92nd Avenue, jumped a median, went airborne and landed in the westbound lanes of 92nd Avenue.

37. Other officers ran across the street to where the Jeep had come to a rest and contacted the driver, who slumped out of the driver's side of the Jeep and to the left.

38. Officer A did not identify himself as a police officer at any time during the pursuit or before he fired his weapon at the Jeep.

39. Officer A was escorted away from the scene by Sergeant Poppinger.

40. Westminster Police officers called for rescue, and the occupant of the Jeep, Ronald, was transported to Good Samaritan Medical Center where he was admitted to the intensive care unit (ICU). On July 1, 2018 at approximately 2:49 p.m. Ronald, at the age of 22 years old, died from his injuries.

41. Ronald was hit by one bullet, which struck him in the back of the head. There is no way officer A could have been looking Ronald in the eyes when he fired. If officer A was telling the truth, the bullet should be in the front of Ronald's head. Officer A is lying – the bullet in the back of Ronald's head shows that the Jeep had already safely passed officer A when the shots were fired.

42. A witness statement that was ignored by district attorneys investigating this matter indicates the Jeep had moved past Officer A and shots were not fired until the Jeep had passed officer A. This witness statement conforms with the physical and factual evidence and confirms that Officer A intentionally and materially misrepresented the facts surtrounding his shooting of Ronald.

43. Secondary bullet trajectory analysis done by investigators shows that three rounds did not enter the windshield but were fired from *behind* the Jeep.

44. The cause of death, as reported by Dr. John Carver, was a single gunshot wound to the back of the head. There was no searing, stippling (i.e. powder tattooing) or gunpowder burns to Ronald's body, which indicates that he was not shot at a close or intermediate range. Ronald was likely shot at a "distant range" rather than intermediate because there is not any searing, gunpowder burns or stippling on the skin surrounding the entry wound.

45. The bullet that killed Ronald entered at the right posterior parietal scalp.

46. The trajectory of the fatal bullet was from back-to-front, slightly right-to-left and slightly upwards.

47. The bullet that killed Ronald did not exit his skull. The bullet that killed Ronald never fully penetrated his skull because the Jeep was traveling away from officer A when shots were fired.

48. At the time of the fatal shooting, Officer A knew that using deadly force was a legal seizure for the purposed of the Fourth Amendment and that deadly force is never allowed unless there is an imminent threat of death or serious bodily injury to an officer or a civilian.

49. No reasonable officer, including Officer A, could have perceived any risk or threat of death or serious bodily injury to themselves or others at the time the Jeep was northbound on Fenton Street and the shots were fired by Officer A.

50. There were no pedestrians or other people in the area, which means deadly force was not used to protect citizens or officers from an immediate threat of death or serious bodily injury.

51. At the time of the fatal shooting, Ronald was not using the Jeep as a deadly weapon to aid an escape.

52. At no time did the Jeep pose a threat of imminent harm to Officer A, Officer DiGiovanni, or anybody else.

53. The Jeep drove past Officer A at a slow speed and safe distance and never came remotely close to making contact with him or his motorcycle.

54. Ronald was not armed with any weapons and did not make any verbal statements indicating he possessed a weapon or would use a weapon against officers or citizens.

55. The use of deadly force by Officer A against Ronald was objectively unreasonable in the totality of the circumstances described in the preceding paragraphs.

56. Officer A's use of deadly force at a time that he was not under immediate threat of death or serious bodily injury from the Jeep is an act by an officer that is either reckless, grossly incompetent, and/or untrained.

57. Properly prudent and trained officers would not have used deadly force in the circumstances that led to the death of Ronald.

58. The City of Westminster has a duty to train their officers in the rules and implementation of the use deadly force. Officer A's actions were grossly incompetent and/or the result of being untrained. Thus, the City of Westminster failed to adequately train officer A in the proper use of deadly force.

## CLAIMS FOR RELIEF
## CLAIMS UNDER FEDERAL LAW, 42 U.S.C. §1983

59. Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

60. The Fourth Amendment of the United States Constitution prohibits unreasonable or excessive use of force in connection with searches and seizures. When restraining, detaining, and/or arresting a person, the Fourth Amendment protections only allow police officers to use the amount of force that is reasonable and necessary under the circumstances.

## FIRST CLAIM FOR RELIEF

**Violation of Fourth Amendment of the United States Constitution**

**Excessive Force Resulting in Death**

**(By Plaintiff Bernadette Romero as Personal Representative of the Estate of Ronald T. Romero against Both Defendants)**

61. Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

62. At the time of the incident, Ronald was "seized" for purposes of the Fourth Amendment. A seizure occurred at the moment Officer A fired his weapon and bullets struck Ronald.

63. Ronald's seizure was patently unreasonable and in violation of the Fourth Amendment to the United States Constitution. "The use of deadly force to prevent the escape of all felony suspects…is constitutionally unreasonable where there is no probable cause to believe the suspect poses an immediate threat to the officer or others, or the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm. *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985).

64. Officer's A's use of deadly force against Ronald when there was no immediate threat of death or serious bodily injury to himself or anyone else was grossly incompetent and/or reckless.

65. Officer A intentionally placed himself in the general path of the Jeep contrary to his training and Westminster Police Department policies and procedures.

66. Officer A purposely fired multiple gun shots into the Jeep and at Ronald from his police motorcycle.

67. Based on ballistic evidence and the coroner's examination, Officer A shot Ronald in the posterior parietal aspect of his skull (i.e. the back of his head). *See* Exhibit 1.

68. Officer A falsely claimed that he shot into the front windshield of the Jeep while simultaneously making direct eye contact with Ronald. *See* Exhibit 2.

69. In so doing, Officer A shot at Ronald with the intention of killing him or with deliberate indifference that aiming and shooting at his head and upper body would result in his death.

70. Officer A did not use any de-escalation techniques or non-lethal alternatives against Ronald or otherwise shoot to incapacitate rather than kill him.

71. The underlying crime that Ronald was allegedly suspected of being involved in was a low-level misdemeanor property crime.

72. Ronald was not armed with any weapons and did not make any verbal statements indicating he possessed a weapon or would use a weapon against officers or citizens.

73. The Jeep that Ronald was driving drove past Officer A at a slow speed and safe distance and thus never came close to making contact with Officer A or his motorcycle.

74. At all relevant times, the Jeep was in control, not driving at unreasonable speeds or making maneuvers that put another person in danger of death or serious bodily injury

75. The Jeep was driving slowly, non-erratically, and away from Officer A, which means there was no objectively reasonable fear that Ronald could use the vehicle to cause serious bodily injury or death to Officer A or anyone else at the precise moment deadly force was used.

76. At no time did Ronald exit the car in an attempt to assault Officer A, other officers, or flee.

77. Based on the totality of the circumstances, Officer A, or any other reasonable officer, did not have any information to believe that Ronald posed a threat of death or serious bodily harm to any officers or citizens at the precise moment deadly force was implemented.

78. The law is very clear: it is unreasonable to shoot the driver of a slow-moving vehicle that is maneuvering in a non-aggressive manner and who does not pose an immediate threat or create a situation where there is a near certainty of death or serious bodily injury to police officers or other third parties. *Adams v. Speers*, 473 F.3d 989 (9th Cir.2007); *Eberhardinger v. City of New York*, 341 F.Supp.3d 420 (District Court, M.D. Pennsylvania 2018); *Kirby v. Duva*, 530 F.3d 457 (6th Cir.2008); Lytle v. Bexar County Tex., 560 F.3d 404 (5th Cir.2009); *Morton v. Kirkwood*, 707 F.3d 1276 (11th Cir.2013); *Orn v. City of Tacoma*, 949 F.3d 1167 (9th Cir. 2020); *Smith*, 430 F.3d (2005).

79. Despite all the information that shows Ronald did not pose a threat of death or serious bodily harm to anybody, Officer A unreasonably used deadly force against Ronald. Officer A's use of deadly force against Ronald is objectively unreasonable in the totality of the circumstances.

80. The acts and/or omissions of Officer A combined to unnecessarily escalate the situation and risks associated with the pursuit, which led to the unnecessary, unlawful and deadly use of excessive force.

81. As a result of the lack of training, experience and/or recklessness and/or gross incompetence, Officer A unreasonably used deadly force to kill an unarmed person that did not pose a danger to him or anybody else. The unreasonable and/or grossly incompetent acts of Officer A to use deadly force and kill an unarmed person is evidenced by the fact that Ronald was shot in the back of the head by an officer claiming that he shot Ronald while looking directly into his eyes.

82. As a result of Officer A's unconstitutional use of excessive and deadly force, Ronald suffered a fatal gunshot wound to the back of his head, and he died several days later from his injuries.

83. While he was still alive, Ronald's prognosis was poor due to extensive intracranial injury consisting of skull fracture, subarachnoid hemorrhage, and bone fragments lacerating the cerebral soft tissue. Thus, Ronald unnecessarily suffered as a result of Officer A's conduct.

84. Officer A's unconstitutional use of excessive, unreasonable, and deadly force resulted in damages to Ronald's Estate in the nature of Ronald's pain and suffering before death, funeral and burial or cremation expenses, loss of future earnings, loss of Ronald's consortium to his immediate family members, and extreme pain, suffering, grief, and loss of companionship to his immediate family members for his permanent loss.

## **SECOND CLAIM FOR RELIEF**

**Failure to Properly Train and/or Policy or Custom of Excessive Force**

**(Plaintiffs Against the City of Westminster)**

85. Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

86. The City of Westminster, through its Chief of Police Tim Carlson, has the ultimate decision-making and policy-making authority for the City of Westminster Police Department and its Officers.

87. As previously stated, it is patently unreasonable to shoot the driver of a slow-moving vehicle that is maneuvering in a non-aggressive manner and who does not pose an immediate threat or create a situation where there is a near certainty of death or serious bodily injury to police officers or other third parties.

88. According to the City of Westminster Police Department Use of Force Policy, the use of deadly force is a measure of last resort, and an officer is "not justified in using deadly force to protect himself or others from assaults that appear unlikely to result in death or seruious bodily injury."

89. Chief Carlson and/or his commanding officers at the City of Westminster Police Department failed to issue a clear policy about the use of deadly force against an unarmed person who posed no threat of death or serious bodily harm to any officers or citizens to all City of Westminster Police Department Officers.

90. Officer A stated that his training with the Westminster Police Department included "basic firearms training", driving training, arrest control training and use of force training. Officer A did not describe any training involving non-lethal alternatives or de-escalation tactics.

91. The City of Westminster Police Department also trained its officers, or otherwise promoted a policy or custom of using gunfire to kill or destroy "threats" rather than shooting to disable them. Part of Officer A's "field training" is instruction to shoot at stationary targets at a distance on a driving course. That training does not involve any de-escalation tactics, non-lethal alternatives or training to deal with non-threatening drivers. Officer A has been trained to shoot-to-kill drivers in exactly Ronald's position.

92. At the time of the fatal shooting of Ronald, Officer A was inadequately trained in the rules and implementation of the use deadly force.

93. Officer's A's use of deadly force against Ronald when there was no immediate threat of death or serious bodily injury to himself or anyone else was grossly incompetent and/or reckless.

94. Officer A has falsely claimed that Ronald's intent was to run him over in order to avoid arrest by police. However, there was not any information available to Officer A that would allow him, or any other reasonable officer, to know or formulate a reasonable belief about Ronald's intent. At no point had Ronald attempted to use the Jeep as a weapon and he did not ever maneuver the Jeep so that any officer or citizen was in its direct path, which indicates there was never intent to cause harm to another person.

95. Officer A has falsely claimed that he shot into the front windshield of the Jeep while simultaneously making direct eye contact with Ronald. If Officer A was telling the truth, the bullet should be in the front of Ronald's head. Officer A is lying – the bullet in the back of Ronald's head shows that the Jeep had already safely passed officer A when the shots were fired.

96. Ronald was not armed with any weapons and did not make any verbal statements indicating he possessed a weapon or would use a weapon against officers or citizens.

97. At the time of the fatal shooting, Ronald was not using the Jeep as a deadly weapon to aid an escape.

98. There was no objectively reasonable threat posed by the Jeep, itself, because the Jeep traveled past Officer A at a slow speed and safe distance and never came close to making contact with Officer A or his motorcycle.

99. There were no pedestrians or other people in the area, which means deadly force was not used to protect citizens or officers from an immediate threat of death or serious bodily injury.

100. Officer A did not use any de-escalation techniques or non-lethal alternatives against Ronald or otherwise shoot to incapacitate rather than kill him.

Case 1:20-cv-01205 Document 1 Filed 04/29/20 USDC Colorado Page 16 of 18

101. The fact that Officer A did not make an effort to disable the Jeep or use non-lethal alternatives before resorting to the immediate use of deadly force indicates a lack of adequate training regarding the rules and implementation of the use of deadly force and/or training to use de-escalation tactics and non-lethal alternatives if at all possible before resorting to deadly force.

102. Officer A was criminally exonerated for his role in the fatal shooting of Ronald by the Office of the District Attorney for the First Judicial District of the State of Colorado.

103. It is unclear whether Officer A received any discipline for his role in the fatal shooting of Ronald.

104. All of these factors and conditions combined to create a policy, custom, culture, and/or environment within the City of Westminster that was deliberately indifferent to, facilitated, promoted, or even condoned the use of excessive and deadly force by its officers in the regular course of contacting, apprehending, and arresting suspects in the Westminster community.

105. As a direct and proximate result of the City of Westminster's policies, customs, police practices, and lack of supervision, training, and communication among its police officers, which led to a deliberately indiffierent culture towards the use of excessive and deadly force, Officer A recklessly and needlessly killed Ronald in the course of trying to apprehend in violation of his constitutional rights.

### THIRD CLAIM FOR RELIEF
**Punitive Damages for Violation of Constitutional Rights under 42 U.S.C. §1983**
**(Plaintiffs against Officer A in his Individual Capacity)**

106. Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

16

107. The Westminster Police Department knew that Officer A was inadequately trained in the use of deadly force and/or grossly incompetent in regard to the rules and use of deadly force. Nevertheless, the Westminster Police Department intentionally allowed officer A to carry firearm and police the citizens of Westminster, Colorado in its jurisdictional bounds.

108. Officer A intentionally used deadly force in an unconstitutional and unlawful manner.

109. The use of unlawful and unconstitutional deadly force was done with deliberate indifference, reckless, and/or callous indifference toward the constitutional rights and likelihood of serious injury or death to Ronald and his decedents.

110. Officer A has recounted his version of the events and circumstances of the incident in ways that are self-serving, inconsistent, and conflicting with the evidence and witness statements, and contrary to physical and observable conditions and evidence.

111. Officer A has expressed absolutely no remorse in hindsight.

112. Accordingly, Officer A should be required to pay the Plaintiffs' additional damages, over and above any actual and compensatory damages, to punish him for his evil intent, willful and wanton conduct, and/or for acting with deliberate, reckless, and/or callous indifference toward the Plaintiffs, and to deter other law enforcement officers from engaging in such conduct in the future.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of the Plaintiffs on their respective claims and against the Defendants, jointly and/or severally, as follows:

a. compensatory damages in an amount that will fully and fairly compensate the Plaintiffs for their respective injuries, damages, and losses, pursuant to 42 U.S.C. §1983;

b. punitive damages pursuant to federal law as punishment and deterrence against the commission of future such conduct;

c. pre- and post-judgment interest;

d. reasonable attorneys' fees, expert witness fees, and the cost of this action, pursuant to 42 U.S.C. §1988 and any other applicable federal or state law;

e. any other relief this Honorable Court deems proper and just.

**PLAINTIFFS DEMAND TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

Dated this 29th day of April, 2020.

Respectfully submitted,
BAUMGARTNER LAW, L.L.C.
*Original signature on file at Baumgartner Law, L.L.C.*

 *s/ S. Birk Baumgartner*
S. Birk Baumgartner, #47829
Baumgartner Law, LLC
300 E. Hampden Ave., Ste. 401
Englewood, CO 80113
Phone: (720) 626-9418
Fax: (720) 634-1018
birk@baumgartnerlaw.com

 *s/ Sean M. Simeson*
Sean M. Simeson, #
Baumgartner Law, LLC
300 E. Hampden Ave., Ste. 401
Englewood, CO 80113
Phone: (720) 626-9418
Fax: (720) 634-1018
sean@baumgartnerlaw.com

Plaintiffs' Address:
c/o Baumgartner Law, L.L.C.
300 E. Hampden Ave., Ste. 401
Englewood, CO 80113